

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 95 C 5040 | **DATE** | 8/24/2001 |
| **CASE TITLE** | US ex rel. St. Pierre vs. Cowan | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** We grant St. Pierre's petition for a writ of habeas corpus based on ineffective assistance of counsel at the sentencing phase of the state court proceedings. We deny the petition in all other respect. We order the State to resentence St. Pierre pursuant to the dictates of the Sixth Amendment within a reasonable period following the date of this order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |

number of notices: 3

AUG 2 7 2001
date docketed

AUG 2 7 2001
date mailed notice

SCT / courtroom deputy's initials

EO-7
FILED FOR DOCKETING
01 AUG 24 PM 2: 37

Date/time received in central Clerk's Office

docketing deputy initials

mailing deputy initials

**Document Number**

88

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>ROBERT ST. PIERRE,<br><br>        Petitioner,<br><br>vs.<br><br>ROGER D. COWAN, WARDEN,<br>MENARD CORRECTIONAL CENTER,<br><br>        Respondent. | )<br>)<br>)<br>)<br>)<br>)      95 C 5040<br>)<br>)<br>)<br>)<br>) |

DOCKETED

AUG 2 7 2001

## **MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

Before the Court is the Amended Petition for a Writ of Habeas Corpus of Robert St. Pierre ("St. Pierre") who has been convicted of murder and sentenced to death. For the following reasons, we grant the petition in part and deny it in part.

## BACKGROUND

Robert St. Pierre ("St. Pierre") has twice been convicted of murder and twice sentenced to death. After an unsuccessful quest for post-conviction relief in the Illinois state courts, he turned to the federal courts for habeas relief. This case has followed a long and circuitous path due in large part to St. Pierre's vacillations and frequent changes of position. We find it provident to review in detail the twists and turns of this path as a precursor to our analysis of St. Pierre's claims for habeas relief.

## 1. The Murder Conviction

On July 29, 1982, nineteen-year-old St. Pierre met with Jackie Gibons and her boyfriend, Barry Wilson, in an alley near Skokie, Illinois to plan the murders of Jackie's parents, Sybil and Benjamin Gibons. Barry Wilson had been complaining to Jackie in early 1982 about the fact that her parents had taken away Jackie's bank book and charge cards and that Jackie could no longer provide Wilson with money. Wilson had solicited St. Pierre, then freshly out of prison, to kill the Gibonses because Jackie wanted them murdered and doing so would pay good money. The prospect of a good payday was inducement enough for St. Pierre to take the lives of a man and woman he had never met.

The alley meeting with Jackie and Wilson convinced St. Pierre that Jackie "wanted it done." St. Pierre arrived at the Gibonses' Skokie, Illinois residence, where he was admitted by Jackie. Jackie introduced St. Pierre to her father, Benjamin Gibons, after which Mr. Gibons walked into the kitchen. At that point, Jackie gave St. Pierre a hammer, the previously agreed upon instrument of death. St. Pierre followed Mr. Gibons into the kitchen and proceeded to bludgeon him repeatedly in the head with the hammer until Mr. Gibons stopped breathing. Wilson was called to the scene and for about an hour, the conspirators attempted to clean up the spattered blood

in the kitchen using rags and towels. Mr. Gibons' body was tied with tape and rope, wrapped in plastic and a blanket, and placed in the master bedroom.

Mrs. Sybil Gibons, who had not been home during the slaughter of her husband, phoned her home and asked Jackie to pick her up at the train station. Jackie did so and Mrs. Gibons and Jackie returned home. When they arrived, St. Pierre was waiting in the hallway with the hammer. As Mrs. Gibons walked through the front door, St. Pierre bludgeoned her in the head with the hammer a number of times. Mrs. Gibons' body was also tied with tape and rope, wrapped in a blanket and plastic, and placed in the master bedroom. After finishing their handiwork, St. Pierre, Jackie and Wilson took the Gibons family car and went for a cruise.

On August 2, Mrs. Gibons' sister notified the police that her sister had not reported to work for several days. A detective went to the house and discovered the carnage left behind. In the midst of the carnage was a belt bearing St. Pierre's name and his prison identification number. The following day, Jackie Gibons gave the police a full statement. Police officers promptly arrested St. Pierre, whom they found asleep on a couch in his mother's apartment. At the time of the arrest, law enforcement officers read St. Pierre his <u>Miranda</u> rights.

The officers transported St. Pierre to the police station to interview him. An exchange ensued between St. Pierre and law enforcement officers, a full rendition of

which appears in <u>People v. St. Pierre</u>, 522 N.E.2d 61, 66-67 (Ill. 1988). At least twice in the exchange St. Pierre informed the state's attorney that he wanted a lawyer (although at several other points St. Pierre expressed a desire to make an immediate statement). Ultimately St. Pierre gave a statement admitting to murdering Benjamin and Sybil Gibons.

A jury trial followed, during which the Judge denied St. Pierre's motion to suppress his statement. A jury convicted him of both murders and several related charges, then a sentencing jury imposed the death penalty. On direct appeal, however, the Illinois Supreme Court reversed the convictions. <u>See</u> <u>St. Pierre</u>, 522 N.E.2d at 68. The Court held that use of the inculpatory statement, in light of St. Pierre's request for an attorney, violated his fifth and fourteenth amendment rights. <u>See</u> <u>id.</u> Because the error was not harmless, a new trial was warranted. <u>See</u> <u>id.</u> at 68, 69.

### 2. *The Remanded Case*

The remanded case was assigned to Circuit Judge Richard Neville. Defense counsel Robert Barasa ("Barasa") was appointed to represent St. Pierre. Although Barasa had once been a public defender, Barasa had never before tried a murder case, much less a capital case. (Barasa Dep. of 3/23/01 at 81.)

Appearing before Judge Neville on August 8, 1988, St. Pierre announced his desire to plead guilty to the charges against him. This announcement surprised many,

since no negotiations had occurred between St. Pierre and the State indicating that a guilty plea might yield a diminished sentence. From the very start, Judge Neville recognized that an issue of competency had presented itself, commenting that "people don't generally plead guilty if [death] is the potential sentence." (Tr. of 8/8/88 at 14.) The Judge accurately predicted that "it is certain someone is going to look at this transcript after whatever we do here and say, 'Was Mr. St. Pierre hitting on all eight when this happened and did he understand everything. . . .'" (Id.)

In light of the "unusual circumstances" that had already presented themselves, Judge Neville decided to conduct a competency hearing later that afternoon. (Id.) As the Judge explained:

> I think at this point it should be made clear in the record that there was no general indication of any specific abnormality on the part of Mr. St. Pierre that required me to ask for an examination. It was merely the unusual circumstances that someone who has gone through an appeal process whose case is overturned and then gets the case sent back here for trial and has the opportunity to be represented by able counsel and has a right to defend himself, then decides in spite of it all to plead guilty to the same charges for which he has now been granted a new trial, and with that in mind, I with the concurrence of the lawyers asked for a doctor to have a conversation and examination of Mr. St. Pierre to decide whether he knew what was going on here. . . .

(Id. at 32.) The hearing featured testimony from Dr. Albert Stipes, a staff psychiatrist at the Cook County Psychiatric Institute who had conducted thousands of mental status

examinations of criminal defendants to determine fitness for trial, pleading or sentencing. (Id. at 17.)

Dr. Stipes testified that St. Pierre possessed a "sophisticated" understanding of the charges against him and the surrounding proceedings. (Id. at 21.) St. Pierre had the ability to recollect events, could communicate with counsel, was oriented as to time, place and persons, and displayed no abnormalities. All of these factors led Dr. Stipes to conclude that St. Pierre was fit to plead guilty to the crimes with which he was charged. After the testimony concluded, Judge Neville observed that St. Pierre had participated meaningfully in the instant proceedings and had cooperated at some length with his previous trial attorney. In light of Dr. Stipes' testimony and the Judge's own observations, Judge Neville concluded that St. Pierre understood the process and was fit to decide to plead guilty.

Notwithstanding this conclusion, the Judge repeatedly expressed his discomfort with the record that was building. One source of his discomfort was the suggestion that St. Pierre was pleading guilty in order to shorten his time at the Cook County Jail, an environment that apparently traumatized St. Pierre far more than Death Row had. Judge Neville explained to St. Pierre why the reversal of the conviction effectively placed him in the custody of the County, rather than the State. The Judge went on to inform St. Pierre that pleading guilty would not necessarily bring about his removal

from the Cook County Jail as quickly as he may like. Moreover, Judge Neville warned St. Pierre several times during the hearing that he could not accept a plea of guilt premised on the desire to move out of Cook County Jail. (Tr. at 32 ("if the decision to plead guilty is not one based on guilt but is based on one of inconvenience, then I don't know if I can accept it. . ."), 41 ("I cannot in good conscience accept a plea of guilty from someone who would tell me that he's only pleading guilty because he's uncomfortable with the conditions, and . . . who would not admit that in fact he's guilty of the crimes charged"), 42 ("I don't want this matter set up here in this courtroom to be one where later on there's an appeal on the basis, 'I only pled guilty because I was uncomfortable.' That's not acceptable to me and I won't take that kind of plea. . .")). St. Pierre assured the Court that "to enter a plea of not guilty, okay, when in fact I did commit the crime would be tantamount to trying to get away with murder, and that's not my intention." (Id. at 105.)

Like Judge Neville, defense counsel Barasa experienced discomfort with St. Pierre's decision. Throughout the hearing defense counsel expressed to the Court his belief that the "whole premise" of St. Pierre's decision to plead guilty was "to leave County Jail over there." (Id. at 106.) Barasa conceded, however, that "it is [St. Pierre's] wish to proceed as he has stated." (Id.) Although Judge Neville entertained defense counsel's reservations and discussed them on several occasions

with St. Pierre, the Judge concluded that St. Pierre "understands what his options are and his rights and he's made that decision [to plead guilty]." (Id. at 107.) The Court accepted St. Pierre's plea of guilt to two counts of murder, two counts of conspiracy, two counts of armed robbery, and two counts of concealment of a homicidal death.

On the following day, August 9, defense counsel Barasa filed a motion to withdraw the plea of guilty and order appropriate pre-trial incarceration. The motion was based on Barasa's belief that St. Pierre was only pleading guilty due to his inability to cope with the conditions at Cook County Jail. Before Barasa had an opportunity to argue it, St. Pierre interjected that the motion "is not my intention. My attorney wants to do that." (Tr. of 8/9/88 at 126.)

In entertaining the motion, Judge Neville reiterated several points from the previous day's hearing. He admonished St. Pierre that

> if you are pleading guilty to this charge merely to get out of jail and you did not in fact commit the acts with which you are charged and which yesterday you plead guilty, and that you are in some way indicating that you are at such a high state of discomfort that you can't stand to get ready for trial and prepare your case and assist your lawyer, and you just have to get out of jail, regardless of whether you are guilty or not guilty of the charges, I cannot and will not accept your plea of guilty.

(Id. at 133.) Conversely, the Judge explained:

> If you are saying to me that you are guilty of these charges, as you did yesterday . . . I can take the plea. But as long as it is done voluntarily, and as long as I am convinced that your motivation in doing this is: one,

that you are in fact guilty of the crime, and two, you feel that it is in your best interest to do it now rather than at some other time.

(Id. at 133-34.) St. Pierre responded:

I am not pleading guilty merely to leave the facility. That, however, is one of the reasons. But the main reason is that I am in fact guilty of the crime.

(Id. at 134.) Judge Neville denied defense counsel's motion.

### 3. *The Mitigation Hearing*

Initially St. Pierre resisted a mitigation hearing, purportedly out of his haste to exit the Cook County Jail. In response, Judge Neville reminded St. Pierre that a mitigation hearing "would be in [his] best interests to put forward in the best light possible." (Id. at 157.) He also commented that

proceeding from zero all the way through a potential death penalty in two days is about as fast as I have ever seen anything done. And it is very important to me that the record does not appear that we are rushing through this thing to get to the conclusion without giving everybody the opportunity to make full and complete value judgments about what's going on.

(Id.) Rather than accept St. Pierre's decision on the spot, Judge Neville suggested that St. Pierre think about it overnight and give a final answer the following day.

During the following day's hearing on August 10, Judge Neville again emphasized to St. Pierre the importance of holding a mitigation hearing. He advised that "this is such a serious matter with such importance in your life that it would seem

to me it would be a good idea to take the time that you think is necessary for that hearing." (Tr. of 8/10/88 at 171.) Defense counsel brought to the attention of the Court the existence of Monte Williams, a psychologist at Menard Correctional Center who could potentially serve as a witness in mitigation. The Court allowed St. Pierre to ponder the decision whether to proceed with a mitigation hearing while the State put on evidence in aggravation. During that presentation, St. Pierre passed a note to his defense counsel indicating that if the mitigation hearing could proceed in fewer than three weeks, he would agree to it. The Court set a hearing for August 30. A conflict later developed with defense counsel's schedule, causing the hearing to be postponed to September 12, 1988.

### a. Motion to Determine Sanity at Time of Crime

At the September 12 mitigation hearing, defense counsel Barasa filed a motion to have St. Pierre examined to determine his sanity at the time of the crime. Evidently Barasa's interview with Monte Williams led him to believe that St. Pierre may have been insane when he committed the murders. In light of these considerations, Barasa felt an "ethical obligation" to file the motion because if St. Pierre were insane at the time of the crimes, he would not have been criminally responsible. In turn, counsel sought to withdraw St. Pierre's plea of guilty. St. Pierre objected to this latter request, however, and Barasa complied. The State challenged the remaining motion.

Judge Neville responded first with a reminder that prior to entering the guilty plea, an expert witness determined that St. Pierre was "lucid, understanding of the proceedings, well versed with the court call, and well versed with what was going on." (Tr. of 9/12/88 at 217.) With respect to insanity at the time of the crimes, the Judge surmised that

> [i]n order for insanity to become an issue in a case, it's not a situation where someone just says, I think that it's a possibility; it's the obligation of the defense to raise it to a level where there's something to address. Now it may be, after listening to [Monte Williams] in this case, that may happen, and it may not. I don't know what the doctor [sic] is going to say. But testifying or talking about possibility is not only very remote, but it doesn't give anybody a chance to know what it is that we are talking about.

(Id. at 217-18.) Despite these concerns about the application of Williams' testimony to an insanity defense, the Judge agreed to hear from Williams because, at the very least, his testimony could go to mitigation. (Id. at 219).

Barasa then called Monte Williams as an expert witness. Williams, an unlicensed psychologist who works the Illinois Department of Corrections, holds a master's degree in psychology. He claims to specialize in "forensic psychology and the area where psychology comes together with anthropology and archaeology." Id. at 223-24. He had never before testified as to the issue of sanity at the time of a criminal offense. Nor had Williams ever formally examined St. Pierre. Rather, while St. Pierre was incarcerated at Menard, he and Williams talked informally several times

over the course of three or four years. Only once, however, did they discuss the murders. That conversation took place approximately three years prior to Williams' testimony.

Williams did not bring St. Pierre's file to Court, which made articulating the diagnosis a cumbersome task. The diagnosis, once elicited, had two components: adjustment disorder with mixed emotional features, and mixed substance abuse disorder. Defense counsel endeavored to steer Williams' testimony toward the issues of psychotic behavior and insanity, but the State lodged several successful objections as to lack of foundation. As defense counsel struggled, he apologized to the Court "for this [direct examination] taking as long as it did, but as you can see, I'm not prepared for the sanity hearing, and I thought the burden was not going to be quite severe." The State shot back that the records referred to in the motion to determine sanity had been available for weeks, and that defense counsel had interviewed Williams more than two weeks prior to the hearing.

With that, defense counsel resumed his direct examination and again attempted to address the issue of mental illness. This time the Judge rejected as too remote a question involving the "possibility" of St. Pierre being psychotic at the time of the murders. (Id. at 249.) According to the Judge, Williams did not demonstrate an

understanding of the legal standard for insanity. Accordingly, he could not furnish an opinion as to it.

The remainder of Williams' testimony covered a variety of topics. Williams described the interest he shared with St. Pierre in "Egyptology," as well as St. Pierre's other intellectual pursuits. Furthermore, Williams explained St. Pierre's history of substance abuse. Williams also discussed the inability of St. Pierre's parents to set boundaries and St. Pierre's resulting "need for affection, approval, purpose, direction, and the acceptance of someone whom he considered stronger than himself." (Id. at 261.)

Judge Neville was "not impressed" by Williams' testimony. (Id. at 327.) In fact, he deemed it "ridiculous." (Id. at 329). The Judge found no credence in Williams' attempts to portray St. Pierre as possibly insane at the time the murders were committed. As the Judge observed:

> [W]hen he was asked what the issues of insanity were . . . he said that it had to do with whether the defendant was a danger to himself and whether he was a danger to society. That, of course, is a self-commitment issue, which is what [Williams] says he's been doing for years, and what he's most familiar with, and has nothing to do with the issues before me in this courtroom.
>
> Secondly, he has no basis, by way of reports, to indicate at the time that he talked to Mr. St. Pierre three years ago . . . if he thought there was some [mental health] issue at that time.

(<u>Id.</u> at 327-28.)  The Judge also discounted Williams' testimony as to St. Pierre's background and substance abuse.  He continued:

> [Williams'] opinion about Mr. St. Pierre's background and substance abuse I find ridiculous.  For him to say that it's possible that someone who uses substances, whether legal or illegal, in an abusive fashion, therefore has a possibility of some type of insanity defense . . . is the type of testimony which leads for the public to feel that the insanity defense is a false defense to begin with.

(<u>Id.</u> at 329-30.)  Consequently, Judge Neville denied the motion to determine St. Pierre's sanity at the time of the commission of the crimes.

### b. Remainder of Mitigation Hearing

Following Williams' "expert" testimony came the lay testimony of Father John P. Smith, the priest who ran Maryville Academy during St. Pierre's stay.  Father Smith had been acquainted with St. Pierre's parents and testified about some of St. Pierre's school and family experiences.  In addition, the Court admitted by stipulation the testimony of St .Pierre's half-brother Raymond Chodorowski pertaining to St. Pierre's early childhood, as well as a report filed in 1983 by Associated Mental Health as to St. Pierre's fitness to stand trial.  Last, St. Pierre took the stand to describe some aspects of his background, including his father's alcoholism, his mother's inability to set boundaries, and ultimately his shipment to a group home.

### c. Judge Neville's Ruling

After hearing the aforementioned evidence in mitigation, Judge Neville presented a thorough analysis of the appropriate sentence. He turned first to the five mitigating factors identified by the state legislature, though he noted that other mitigating evidence could be used if appropriate. The Judge enumerated the five factors and gave lengthy explanations of why each did not apply. With respect to the mitigating factor of "extreme mental or emotional disturbance," Judge Neville observed:

> Although not such to constitute a defense to the prosecution, there has been significant testimony here about Mr. St. Pierre's mental and emotional milieu and during that period of his life and an explanation that over the last five years he has been in custody that has been changed. There has been no testimony that Mr. St. Pierre ever suffered from mental disease or defect, only that Mr. St. Pierre suffered from a childhood in which he was neglected, but interestingly enough to me that abuse . . . does not relate to his physical abuse.

(Id. at 386.) The remaining evidence indicated merely that

> Mr. St. Pierre had two parents who were alcoholics, that they were dysfunctional parents in that they were unable to provide leadership and maybe the opportunity for Mr. St. Pierre to develop in other areas or otherwise, but there has never been any testimony that they abused him. As a matter of fact, it has been just the opposite. [. . .] [I]t is difficult to conceive . . . [that] this type of violence can be attributed to a person who even [lived] in appropriate love rather than violence.

(Id. at 387.) The Judge concluded that none of the five factors nor any other mitigating factors applied to St. Pierre.

Judge Neville then identified as the "turning point" of his decision the "fact that the killings took place about one half hour apart from each other. Not only were they planned, not only were they done for money, not only were they done without warning, not only were they done without good reason on anybody's part, but after one murder was committed, to wait for half an hour to commit the same type of murder on an elderly woman is so repugnant to our standards in society that no one can explain how a normal human being can do that to another person." (Id. at 395-96.) Judge Neville ordered a sentence of death.

### 4. *Post-Sentencing Motions*

St. Pierre responded to the sentence with a flurry of motions. In February 1989, in response to one of the motions, the Court revisited the issue of St. Pierre's sanity at the time of the murders. Following oral argument, St. Pierre expressed to the Court his unwillingness to undergo a psychiatric examination. Declining to "rush ahead" by denying the motion, Judge Neville ordered St. Pierre to be examined by Dr. Stipes as to the issue of sanity at the time of the offenses. (Tr. of 2/14/89 at 436.) Dr. Stipes complied with the order and testified that on the date of the crime St. Pierre was able to appreciate the criminality of his conduct. Persuaded by the testimony, the Court found that St. Pierre was sane at the time of the murders. (Id. at 455.) In doing so, the Judge again rejected Monte Williams' testimony.

*5. State Post-Conviction Proceedings*

St. Pierre continued to vacillate through the state post-conviction proceedings. A detailed account of those events appears in the Seventh Circuit's opinion of this matter. See <u>St. Pierre v. Cowan</u>, 217 F.3d 939, 943-45 (7th Cir. 2000). A condensed version serves our purposes. St. Pierre's counsel filed a petition for post-conviction relief signed by St. Pierre. Shortly after counsel served the petition, however, St. Pierre filed his own *pro se* motion in the Illinois Supreme Court to waive further appeals. The Illinois Supreme Court ordered the Circuit Court to conduct a competency hearing to determine the validity of St. Pierre's waiver.

At the competency hearings, which occurred on March 24, April 4 and April 7, 1995, several psychiatrists testified as to St. Pierre's medical condition. Dr. Henry Lahmeyer opined that St. Pierre suffered from bipolar disorder. Bipolar disorder can affect a person's ability to make rational decisions about his future. In Dr. Lahmeyer's opinion, St. Pierre was not fit to waive his appeals.[1] Dr. Henry Conroe agreed with the diagnosis of bipolar disorder, adding that St. Pierre had in addition a mixed personality

---

[1] Unlike Monte Williams, Dr. Lahmeyer formulated his opinion based on his examination of St. Pierre and numerous related documents. Dr. Lahmeyer testified that he relied on a psychological evaluation by Dr. Hemmerich, a psychiatric evaluation by Dr. Kelly, psychological testing by Dr. Grossman, St. Pierre's motions to waive his appeals and then to withdraw his waiver, childhood documents from the Maryville Academy, psychological testing and reports from St. Pierre's childhood, and correctional institution records. (Tr. of 3/24/1995, Testim. of Dr. Lahmeyer, at 16-17.)

disorder with antisocial borderline and schizotypal features.[2]  A third psychiatrist,

Dr. Jonathan Kelly, concurred with Dr. Conroe's diagnosis.[3]  Dr. Stipes later testified,

adhering to his view that St. Pierre was capable of waiving his rights.  On cross-

examination, however, Dr. Stipes admitted that he had never looked to see whether

St. Pierre had bipolar disorder.

In an order dated April 24, 1995, Judge Neville concluded that although

St. Pierre suffers from a psychiatric disorder, the disorder did not interfere with his

ability to make a rational decision to waive his appeals.  The case then returned to the

Illinois Supreme Court.  However, on May 2, 1995, St. Pierre sent a handwritten letter

to the Illinois Supreme Court reviving his requests to waive further appeals.  The

following day, he sent a second handwritten letter to the Illinois Supreme Court

---

[2]  Unlike Monte Williams, Dr. Conroe formulated his opinion based on his examination of St. Pierre and numerous related documents.  Dr. Conroe relied on records from the Juvenile Protective Association, the Department of Children and Family Services, Maryville Academy, River Trails School District, Northwestern Memorial Hospital, Illinois Department of Corrections, Circuit Court of Cook County, and Forensic Clinical Services, and Cermak Hospital.  He also relied on St. Pierre's motion to waive appeals and his petition for post-conviction relief, along with psychological evaluations of Dr. Henry Lahmeyer, Dr. Linda Grossman, and Dr. Jonathan Kelly.  (Tr. of 3/24/95, Testim. of Dr. Conroe, at 16-17.)

[3]  Unlike Monte Williams, Dr. Kelly formulated his opinion based on his examination of St. Pierre and numerous related documents from the Juvenile Protective Association, River Trails School District, Department of Corrections, Cermak Hospital, and psychologist Irving Wass.  (Tr. of 3/24/95, Testim. of Dr. Kelly, at 16-18.)

apologizing for his ambivalence and asking the Court to disregard the previous day's letter. The Court did not. Instead, it issued an order denying the motion to withdraw the waivers and granting the motion to waive appeals. It set an execution date of September 20, 1995.

### 6. Post-Conviction Discoveries

St. Pierre's post-conviction counsel have investigated St. Pierre's medical and mental history. Through "garden-variety subpoenas," (St. Pierre's Compr. Mem. of 5/30/01 (hereinafter "Compr. Mem.") at 6), St. Pierre's attorneys have obtained records illuminating a pattern of troubling behavior. For instance, in a letter dated March 29, 1973, two caseworkers employed by the Juvenile Protective Association described St. Pierre as "hyperactive" and noted his propensity for "destructive behavior." (Exh. A, St. Pierre's Requests to Admit.) The authors attributed the behavior in part to St. Pierre's home environment. (Id.) Apparently St. Pierre's father had encouraged St. Pierre to kill his mother should she threaten him. (Id.) That same year, staff members at Maryville Academy documented their concern that St. Pierre might suffer from a "malignant psychopathology." (Id. Exh. D.)

Furthermore, these records reveal that as a ten-year-old, St. Pierre underwent psychological testing at Maryville. (Id. Exh. C.) The test results depicted St. Pierre as "moderately disturbed," citing depression as his most significant problem, followed

by anxiety, anger, hostility and frustration. (Id.) In a later "Confidential Psychological Report" conducted by the River Trails School District in 1974, Dr. Irving Wass stated that St. Pierre was prone to "aggressive and senseless acts," particularly when he was in groups. (Id. Exh. E.) Dr. Wass predicted that St. Pierre would develop paranoia "if present trends continue." (Id.) A later staff report dated April 14, 1976, seconded that prediction, stating that although St. Pierre did not presently exhibit paranoia, "this could come later, however, if the present trend continues." (Id. Exh. F.)

Subsequent reports confirmed St. Pierre's psychological and behavioral problems. In 1976, St. Pierre's principal classroom instructor reported that the thirteen-year-old St. Pierre was "easily excited and distracted" and had "poor self control of emotions" as well as "many bizarre patterns." (Id. Exh. G.) The following year, a school psychiatrist depicted St. Pierre's psychological profile as "quite disorganized and overly complex," leaving St. Pierre "defenseless in the face of external or internal threats. He is continuously threatened by his own affect which seems to easily diminish his intellectual affectiveness and dictate impulsive behavior." (Id. Exh. H.)

These records never surfaced at any of the state court proceedings because Barasa never obtained them. They do not appear in his case file, and he cannot recall subpoenaing them. (Barasa Dep. at 68-76.) Because Barasa did not obtain the

information, neither Monte Williams nor Dr. Stipes had access to the information when formulating their diagnoses. (Id. at 77-78.)

### 7. *Habeas Corpus Proceedings*

After filing a petition for a writ of habeas corpus in this court on November 28, 1995, St. Pierre again displayed his propensity to vacillate. On January 17, 1996, St. Pierre filed *pro se* a motion to dismiss his own petition and waive further federal review. Two days later, he asked through his attorney to withdraw the motion. On two subsequent occasions he filed similar motions to waive appeals. After we denied those motions, we issued a memorandum and order dismissing the petition on the merits. We found that St. Pierre had exhausted his state remedies but procedurally defaulted five of his seven claims. We dismissed the remaining two claims on the merits.

St. Pierre appealed our decision to the Seventh Circuit. The Seventh Circuit reversed and remanded in part and affirmed in part, holding that the five claims were not procedurally defaulted because St. Pierre did not clearly waive his right to pursue state post-conviction remedies and because St. Pierre's letter of May 2 was "neither written nor filed under circumstances that assured its compliance with governing [Illinois] Supreme Court standards." St. Pierre, 217 F.3d at 950. In addition, the Seventh Circuit remanded for further fact-finding as to Claim V, in which St. Pierre argued that the trial judge improperly instructed him as to Illinois' unanimity

requirement for juries imposing the death sentence. The Seventh Circuit affirmed our dismissal of Count VII.

Before us now is the remanded case. In his Comprehensive Memorandum in Support of his Amended Petition for a Writ of Habeas Corpus, St. Pierre asserts several grounds. First, he maintains he received ineffective assistance of counsel at every stage of his conviction and sentence. St. Pierre next asserts that his convictions and sentence rest on an inadequate and erroneous determination of his fitness to stand trial. In addition, he argues that his guilty plea was invalid and that we should conduct further fact-finding as to whether he was affirmatively misled as to the unanimity requirement for capital sentencing in Illinois.

## DISCUSSION

### 1. Ineffective Assistance of Counsel

As St. Pierre writes in his brief, the "unifying theme" of his attack on his conviction and sentence is the allegedly ineffective assistance of his defense counsel. It is with this issue that we begin our analysis of the petition. St. Pierre maintains that ineffective assistance of counsel infected "every stage of his conviction and sentence." (Compr. Mem. at 16.) According to St. Pierre, defense counsel was ineffective at the guilty plea stage by failing to apprise St. Pierre of all of the elements of the offenses to which he pleaded guilty. Furthermore, defense counsel was ineffective by failing

to investigate and develop an insanity defense. Later, at the sentencing stage, defense counsel was ineffective by failing to gather adequately mitigating evidence as to St. Pierre's mental health. St. Pierre believes that each cited instance alone establishes a deprivation of his constitutional rights and notes that the "cumulative impact" of these instances would also support his claim.

### a. Legal Standard

In order to establish deprivation of the constitutional right to effective assistance of counsel, the petitioner must show two components. First, he must demonstrate that counsel's performance fell below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 688-94 (1984); Williams v. Taylor, 529 U.S. 362, 390-91 (2000). In assessing counsel's performance, we "evaluate the conduct from counsel's perspective at the time, and indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional conduct." United States v. Ashimi, 932 F.2d 643, 648 (7th Cir. 1991). If the record supports a finding of substandard performance, we next determine whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." United States v. Starnes, 14 F.3d 1207, 1209-10 (7th Cir. 1994). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

### b. *Ineffective Assistance of Counsel at the Guilt Phase*

St. Pierre contends that he received ineffective assistance of counsel during the guilty plea stage when defense counsel failed to apprise him of all of the elements of the offense and failed to investigate and develop an insanity defense. According to St. Pierre, defense counsel should have told him that the element of insanity, once raised by St. Pierre, would have had to have been proven by the State beyond a reasonable doubt. Further, defense counsel should have explained to St. Pierre that he could pursue insanity as a defense and investigated and explored this option. Despite these urgings, however, we are "not so uncertain about the fundamental fairness of the guilt phase that our confidence in the outcome is shaken." Antwine v. Delo, 54 F.3d at 1357, 1365-68 (8th Cir. 1995) (finding ineffective assistance of counsel at sentencing but not at guilt phase); see also Skaggs v. Parker, 235 F.3d 261, 268, 275 (6th Cir. 2000) (holding same); Emerson v. Gramley, 91 F.3d at 905, 907 (7th Cir. 1996) (holding same).

For a number of reasons, we are not only not uncertain about the fundamental fairness of the guilt phase of the proceedings before Judge Neville, but are convinced that those proceedings satisfied Constitutional standards in their fullest measure. No reasonable reviewer of Judge Neville's treatment and resolution of the issues presented by St. Pierre's offer to plead guilty will fail to be impressed by the lengths he went to

insure St. Pierre's competence to plead guilty. It was, after all, Judge Neville's initial questioning of the guilty plea offer that led to the elaborate treatment of the question of competence. It was a primer of fundamental fairness.

Equally unassailable was Judge Neville's conclusion that St. Pierre was competent to plead guilty. St. Pierre was not new to the criminal justice system as a general matter, and he had already been through one trial and some appeals in the very case he was acknowledging his guilt in. Hearings were held and expert testimony on competence was received. Nothing then presented nor later discovered fairly calls into question St. Pierre's capacity to plead guilty.

Also not open to any question was St. Pierre's knowing and voluntary desire to plead guilty. Indeed, over his own counsel's objections and Judge Neville's repeated admonitions, St. Pierre was insistent on the path he chose. It is not for us to decide whether we would have acted similarly or whether, indeed, St. Pierre was foolish. Fundamental notions of fairness do not require wisdom of choice, only the capacity to make one. Is it too much to accept St. Pierre's own explanation that he was pleading guilty because "I am in fact guilty of the crime." Given the horrific nature of his crime – murdering two innocent strangers – it is not legally unacceptable, or even questionable, for a man to begin to come to terms over what he once did.

Our review of the record enforces the view that nothing could or would change St. Pierre's decision to plead guilty. The transcripts depict a stubborn St. Pierre who insisted on pleading guilty despite the protests of those surrounding him. Defense counsel voiced his objection to St. Pierre's plea; St. Pierre ignored him. Judge Neville clearly and repeatedly warned him of the potential consequences of his guilty plea, including capital punishment. St. Pierre was unmoved and undeterred.

St. Pierre, more than once, acknowledged his understanding of the charges, his rights, and the possible consequences of conviction. He later resisted his attorney's attempt to withdraw his guilty plea. The possibility of an insanity defense was raised and discussed; no greater elaboration of insanity as an element of the crime or possible defense by the Judge was called for, nor can it be suggested that St. Pierre was, in any sense, of a mind to alter his course. The entirety of the record and St. Pierre's own conduct remove any possibility, much less a reasonable probability, that the outcome of the proceedings would have been different as to guilt.

St. Pierre claims through his present counsel that trial counsel was ineffective because he failed to investigate and develop a possible insanity defense. However, St. Pierre's refusal to withdraw his guilty plea made such investigation virtually impossible for Barasa. In light of St. Pierre's obstinance, and of his repeated assertions of guilt throughout the proceedings, we cannot say that there is a reasonable probability

that the outcome of the proceedings would have been different had Barasa investigated and developed an insanity defense.

In its essentials, this case is remarkably similar to the <u>Antwine</u> case. 54 F.3d 1357. Antwine had been convicted at trial of capital murder, second-degree murder, and first-degree robbery. See <u>id.</u> at 1360. He was sentenced to death for the murder of Eric Jones and to life imprisonment for the murder of Winston Jones. See <u>id.</u> Antwine argued in his habeas petition that trial counsel was ineffective in failing to investigate fully and present evidence of his mental condition at the time of the murders, and that this ineffectiveness prejudiced his defense at both the guilt and penalty phases of his bifurcated trial. See <u>id.</u> at 1364.

Although trial counsel requested and received a court-ordered mental examination, it consisted of only one twenty-minute interview and a review of the police background sheet. See <u>id.</u> at 1365. Trial counsel was aware, through the police report, that Antwine had been acting strangely a few days before the offense. See <u>id.</u> Finding his client to be articulate, lucid, and cooperative, however, trial counsel did not request an independent, second mental examination even though state law afforded the right to one. See <u>id.</u> A battery of examinations conducted several years after the offense at the request of post-conviction counsel produced evidence that Antwine

suffered from bipolar disorder, a lifetime condition that usually arises in early adulthood. See id.

At trial, Antwine's counsel focused on a self-defense theory. See id. at 1366. Although finding that trial counsel's failure to request a second mental examination is more like inadequate trial preparation than a strategic choice, the Eighth Circuit Court of Appeals, in an opinion by Chief Judge Richard Arnold, held that, in the face of Antwine's own firm decision against a less-than-complete defense, it was not unreasonable of counsel not to make a diminished capacity argument in the guilt phase. See id. at 1367.

Given the instant record establishing the firm and unyielding decision by St. Pierre to plead guilty against trial counsel's advice, and the trial judge's initial expression of skepticism, there is no question in this Court's mind that any failure to further investigate or pursue the notion of an insanity defense in the guilt phase of the proceedings is of no legal consequence.

### c. Ineffective Assistance of Counsel at the Sentencing Phase

Unlike the guilt phase, the events surrounding the sentencing phase have shaken our confidence in the outcome of the proceedings. See Strickland, 466 U.S. at 694. The scope of mitigation evidence at sentencing is much broader than the range of relevant information used to determine culpability. See 720 ILCS 5/9-1(c), (e) (placing

no limitation on possible mitigating factors and stating that rules of evidence do not apply at sentencing). Given the broader use of evidence at sentencing, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation. See Emerson v. Gramley, 883 F. Supp. 225, 242 (N.D. Ill. 1995). This is especially true where the defendant faces the death penalty, given the Supreme Court's mandate that capital sentences be imposed on a case-by-case basis according to individualized assessments of the particular characteristics of the defendant as well as the circumstances of the crime. See Penry v. Lynaugh, 492 U.S. 302, 317 (1989); Zant v. Stephens, 462 U.S. 862, 879 (1983); Gregg v. Georgia, 428 U.S. 153, 189 (1976). Thus, an attorney representing a capital defendant must undertake a reasonable investigation into potential mitigating evidence. Failure to investigate a mental condition warranting further inquiry constitutes ineffective assistance of counsel. See, e.g., Foster v. Schomig, 223 F.3d 626, 640 (7th Cir. 2000) (Rovner, J., concurring in part and dissenting in part).

In conducting the investigation, defense counsel must make a "significant effort" to mitigate the client's punishment. Stewart v. Gramley, 74 F.3d 132, 135 (7th Cir. 1996) (quoting Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir. 1989)). While defense counsel need not investigate "with the thoroughness of a biographer," id., counsel must respond reasonably to appropriate indicators worthy of further inquiry. For instance,

"[s]ometimes it will be apparent from the evidence concerning the circumstances of the crime, from conversations with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will repay further investigation, and then the failure to investigate will be ineffective assistance." Id. (citing Brewer v. Aiken, 935 F.2d 850, 857-58 (7th Cir. 1991)); Antwine, 54 F.3d at 1365-68.

In Emerson v. Gramley, the Seventh Circuit held that Emerson received ineffective assistance of counsel where his defense counsel failed to conduct any investigation into the possible existence of evidence of mitigating circumstances. See 91 F.3d at 906. Without such an investigation, defense counsel could not offer meaningful advice to his client as to whether to try to present evidence in mitigation. See id. The Seventh Circuit concluded that counsel's deficient performance may well have been responsible for the death sentence, at least with sufficient probability to establish a denial of the right to effective assistance of counsel at the sentencing phase. See id. at 907. The Court wrote:

> With no evidence of mitigation before the jury despite irrefutable
> evidence of aggravating circumstances, with need to convince only one
> of twelve jurors to refuse to go along with a death sentence, and with no
> statutory or caselaw definition of mitigating circumstances that might
> enable us to say that the mitigating circumstances found in the
> investigation by Emerson's current lawyers are in fact irrelevant, the
> possibility that a case in mitigation along the lines devised by these

> lawyers might have saved Emerson from the death penalty cannot
> confidently be reckoned trivial.

Id. (internal citations omitted). Accordingly, the Court set aside Emerson's sentence

of death. See id.

In other circumstances, defense counsel might conduct an investigation into

mitigating circumstances and present evidence thereunder, but the investigation is so

cursory, and the impact of the evidence so unremarkable, that as a practical matter it

amounts to no investigation at all. Such was the case in Skaggs v. Parker, where the

Sixth Circuit concluded that defense counsel's renewed and exclusive reliance at

mitigation on a witness who had performed incompetently at trial fell below an

objective standard of reasonableness. See 235 F.3d 261, 270 (6th Cir. 2000). At trial,

Skaggs' counsel called as a witness Dr. Elya Bresler, a psychiatrist whose testimony

was "rambling, confusing, and, at times, incoherent to the point of being comical." Id.

at 264. Though defense counsel acknowledged that the psychiatrist had not been a

competent witness, counsel called him to testify in the sentencing phase of the trial,

partly due to counsel's tardiness in locating an alternate expert witness. See id. at 270.

The Sixth Circuit deemed this decision unreasonable:

> Counsel's decision to call Bresler at the retrial of the penalty phase,
> despite their belief that Bresler's testimony could realistically be more
> harmful than helpful, simply because counsel believed it would not be
> worth their time to request additional money from the court, cannot be
> deemed to have been a reasonable exercise of professional judgment.

- 31 -

Id. By failing to introduce competent mitigating evidence, defense counsel "essentially failed to put on any mitigating evidence at all." Id.

As we previously described, the Eight Circuit has held that defense counsel's failure fully to investigate the disorder did not constitute ineffective assistance of counsel during the guilt phase of the proceedings. See Antwine v. Delo, 54 F.3d at 1368. At the sentencing hearing, however, defense counsel put on only one witness, Antwine's brother, who asked the jury for mercy. See id. Counsel later defended this decision as "strategic," stating that he did not investigate fully Antwine's mental condition because he feared that evidence of mental impairment would have been inconsistent with the self-defense claim presented in the guilt phase of the trial. See id. at 1367. The Eighth Circuit rejected this invocation of strategy, however, concluding that a full investigation would likely have unearthed evidence that Antwine suffered from bipolar disorder. See id. at 1367-68. Such evidence may have changed the jury's decision as to the appropriateness of capital punishment. See id. at 1368.

Like Skaggs, the case before us features an investigation so cursory, so perfunctory, that it can hardly be called an investigation at all. See 235 F.3d at 270. Had a reasonable investigation occurred, it would have revealed St. Pierre's now-thrice-diagnosed bipolar disorder which could have served as a mitigating factor at sentencing. See Antwine, 43 F.3d 1368. Because we cannot say with any confidence

- 32 -

that St. Pierre's possible bipolar would not have changed the Judge's decision to impose capital punishment, we find that St. Pierre received ineffective assistance of counsel at the sentencing phase of the proceedings.

Monte Williams served as that "source of information" that triggered defense counsel Barasa's duty to investigate fully St. Pierre's mental health. Stewart, 74 F.3d at 135. In an interview with Barasa, Williams diagnosed St. Pierre as suffering from adjustment and substance abuse disorders and suggested further that St. Pierre may have been insane at the time of the murders. Instead of following up on this potentially mitigating information, Barasa terminated his investigation. Barasa did not subpoena St. Pierre's prison records. He did not subpoena any of St. Pierre's medical or psychiatric records. He did not subpoena St. Pierre's records from various institutions he attended as a child.

These documents could have averted the imposition of the death penalty. Obtained by St. Pierre's postconviction counsel through "garden-variety" subpoenas, the records manifest a disturbing pattern of behavior beginning early in St. Pierre's childhood. His history is replete with mentions of hyperactivity, uncontrollability and destructiveness. Several records explicitly predict that paranoia was looming. Had these documents been presented as mitigating evidence, they might well have convinced Judge Neville that St. Pierre suffered from extreme emotional disturbance.

Barasa, however, proceeded without the benefit of these documents. Nor did he retain as a witness a board-certified psychiatrist competent to render an opinion as to St. Pierre's mental health. Instead, Barasa relied exclusively on Monte Williams, a reliance which proved fatal – literally – to St. Pierre. On the stand, Barasa tried to gear Williams' testimony toward the issue of insanity, but Williams revealed a complete lack of understanding of the legal standard for insanity. Try as Barasa might, he could not elicit any meaningful opinion testimony about St. Pierre's alleged insanity. This should have come as no surprise, as Judge Neville had warned Barasa several times how "remote" the possibility was that Williams would offer probative testimony as to St. Pierre's sanity at the time of the commission of the offenses. (Tr. of 9/12/88 at 217-18.)

Nor did Williams offer any meaningful testimony in mitigation. Barasa had difficulty eliciting Williams' diagnosis because Williams did not have St. Pierre's prison file in his possession. When Williams finally managed to articulate the diagnosis – adjustment disorder with mixed emotional features, and mixed substance abuse disorder – he failed to bolster it. His references to St. Pierre's childhood established only that his parents failed to set boundaries and suffered from substance abuse. These assertions, of course, fell far short of establishing "extreme emotional disturbance" that mitigated St. Pierre's sentence. 720 ILCS 5.9-1(c).

Judge Neville rejected as "ridiculous" and "esoteric" the notion that such parenting should mitigate the punishment for St. Pierre's crimes. As the Judge reflected later in the hearing, "[t]here has been no testimony that Mr. St. Pierre ever suffered from mental disease or defect." (Tr. at 385.) Like the "rambling," "confusing" and "incoherent" psychiatrist in Skaggs, 235 F.3d at 264, Monte Williams' "ridiculous" and "esoteric" testimony was not probative of St. Pierre's mental status. (Tr. of 9/12/88 at 329) The illogical testimony that Barasa attempted to put into evidence was, practically speaking, not evidence at all. See Skaggs, 235 F.3d at 270 (stating that failure to present competent mitigating evidence is essentially a "fail[ure] to put on any mitigating evidence at all").

That Barasa's investigation into St. Pierre's mental health started and stopped with Monte Williams is unreasonable.[4] Barasa failed to pursue the many other obvious avenues that presented themselves. He did not issue the "garden-variety" subpoenas that could have produced critical information about St. Pierre's troubled mental history. He did not arm Williams with useful background information and records to support and elaborate upon Williams' diagnosis. In fact, Barasa failed even to subpoena St. Pierre's records from Menard for Williams to consult as he testified. Instead,

--------

[4] Although Barasa presented in mitigation testimony from St. Pierre's stepbrother and Father Smith, neither could offer expert opinions as to St. Pierre's mental health.

Williams – experienced in civil commitment, not insanity – appeared in court empty-handed to provide testimony that did nothing at all to mitigate St. Pierre's plight.

Turning to the second prong of Strickland, we find a reasonable probability that, but for Barasa's failure to investigate adequately St. Pierre's mental health, Judge Neville would have concluded that the balance of aggravating and mitigating factors did not warrant death. See Foster v. Schomig, 223 F.3d at 636-37. That is, had Barasa fully investigated St. Pierre's mental condition, he would likely have discovered evidence that St. Pierre suffers from bipolar disorder. See Antwine, 54 F.3d at 1368. Evidence of bipolar disorder could have accounted for extreme emotional disturbance that would mitigate St. Pierre's penalty. See 720 ILCS 5.9-1(c). Establishing this single mitigating factor would have secured a life sentence for St. Pierre rather than the death penalty. See 720 ILCS 5/9-1(h). Where the life of a human being is at stake, the impact of the failure to present meaningful evidence about his mental health when that evidence is available "cannot confidently be reckoned trivial." Emerson, 91 F.3d at 907. This is particularly true in the instant case, where Judge Neville exercised great caution and restraint in imposing the death penalty. Though the Judge would have been amenable to entertaining evidence in mitigation of St. Pierre's mental infirmity, no credible evidence was presented to him. As the Judge recited and evaluated the

statutory mitigating factors, he cited the lack of testimony that St. Pierre _ever_ suffered from a mental disease or defect.

We now know that several documents existed at the time of sentencing illustrating St. Pierre's long history of mental difficulties. These revelations may well have affected Judge Neville's analysis and thereby furnished "[St. Pierre's] one chance at mitigation – and his avoidance of a death sentence. . . ." Skaggs, 235 F.3d at 273. Accordingly, a reasonable probability exists that but for Barasa's substandard performance in not investigating St. Pierre's mental health history, the sentencer would not have imposed the death penalty. See Foster, 223 F.3d at 636-37. We conclude that St. Pierre received ineffective assistance of counsel at the sentencing stage and is entitled to a new sentencing hearing.

### 2. Fitness to Stand Trial

St. Pierre next contends that defense counsel's failure to investigate adequately St. Pierre's mental condition "infected the entire guilty plea and sentencing proceedings." First, he claims that his decision to plead guilty "belies any 'rational understanding' of the consequences" of that decision, particularly because he purported to base his plea on his desire to obtain transfer from Cook County Jail as quickly as possible. We cannot accept this argument, however, because Judge Neville has thoroughly – indeed, exhaustively – considered and rejected it. When St. Pierre first

announced his intention to plead guilty, the Judge Neville went to extraordinary lengths to ensure the quality of that plea. From the start, Judge Neville recognized that a critical issue of competency had presented itself. In light of these unusual circumstances, he ordered a competency hearing to be held. An expert witness found St. Pierre fit to enter a guilty plea, and Judge Neville concurred. These findings convince us of St. Pierre's fitness to plead guilty.

Furthermore, with respect to St. Pierre's need to expedite his departure from Cook County Jail, Judge Neville addressed and resolved that issue with care. On several occasions over the span of two days, the Judge warned St. Pierre that he could not accept a plea of guilty premised solely on St. Pierre's desire to leave the jail. Each time St. Pierre assured the Judge that he was pleading guilty because he was in fact guilty of the crime, not merely because he wished to leave Cook County Jail. Judge Neville found that St. Pierre understood his rights and options, and the Judge accepted the plea of guilt. In light of these thorough and deliberate proceedings, we shall not disturb Judge Neville's findings.

St. Pierre also argues that bipolar disorder propelled him to the "impulsive, irrational, destructive" decision to plead guilty. (Compr. Mem. at 31.) The record cannot support this claim. An independent psychiatrist, Dr. Stipes, examined St. Pierre at the time of the plea and found him fit to plead guilty to the crimes with which he was

charged. Significantly, Dr. Stipes was the only trained professional who examined St. Pierre <u>at the time of the plea</u>. After a careful and thorough hearing, Judge Neville accepted this finding. The validity of this finding is not changed merely because one psychiatrist seven years later found "evidence to <u>suggest</u>" that St. Pierre did not appreciate the effects of his actions at the time he entered his guilty plea. (Hemmerich Eval., Exh. I, at 8.) Both the untimeliness of this opinion, as well as its equivocal language, diminish its probative value.

Furthermore, St. Pierre's conduct throughout the culpability phase does not indicate impulsiveness or irrationality. St. Pierre committed at the onset of the proceedings to his decision to plead guilty. Despite the admonitions of both his own counsel and the Judge, he never wavered from this decision. Even defense counsel's attempt to withdraw the plea of guilty did not sway St. Pierre, who resisted this effort. Given Dr. Stipes' assessment of St. Pierre at the time of the plea, as well as St. Pierre's conduct in court, we reject the contention that St. Pierre entered his plea irrationally or impulsively.

### 3. *Validity of Guilty Plea*

St. Pierre next argues that his guilty plea was invalid. First, he contends that his plea was not "intelligent" because he was not informed that the State would have had to prove him sane beyond a reasonable doubt if St. Pierre had presented some evidence

of legal insanity.  The Constitution requires an affirmative showing that a plea is made

intelligently and voluntarily.  See Boykin v. Alabama, 395 U.S. 238, 242-44 (1969).

A plea is not intelligent if "neither [the defendant], nor his counsel, nor the court

correctly understood the essential elements of the crime with which he was charged."

Bousley v. United States, 523 U.S. 614, 618 (1998).  Under Illinois law, St. Pierre's

sanity at the time of the crime was not an essential element of the crime.  See People

v. Cundiff, 749 N.E.2d 1090, 1096-97 (Ill. App. 2001) (stating that insanity is an

affirmative defense and that the "State is only required to prove the elements of the

offense beyond a reasonable doubt, not that the defendant is sane beyond a reasonable

doubt").  Consequently, St. Pierre cannot claim that he was not informed of an essential

element of the crime.  Nor can he persuade us that he should have been apprised of the

availability of insanity as a defense, for the Constitution does not require that every

possible defense be enumerated to the accused.  Such a rule would impose an

impossible burden upon trial judges and defense counsel.

Contrary to St. Pierre's representations, the record before us reflects ample

evidence that the plea was knowing and voluntary.  St. Pierre had already participated

in a complete trial, so he was well aware of the nature of the charges and evidence

against him as well as the available defenses.  Notwithstanding this familiarity, the

Judge held a thorough and extensive plea hearing.  The Judge highlighted each of the

charges against St. Pierre, and the State read into evidence the stipulated testimony forming the factual basis of the plea. St. Pierre indicated repeatedly that he understood each of the charges and had already heard much of the testimony at the trial. Once the Judge found a sufficient factual basis for the plea, he elicited from St. Pierre an acknowledgment that he understood the various waivers he was making by pleading guilty. The Judge informed St. Pierre of the possible sentencing range and St. Pierre said he understood. Then the Judge spoke in greater detail about the rights being waived. Due in part to the thoroughness of the proceedings, they spilled over into the following day.

Judge Neville's deliberateness, as well as the sophistication and understanding that St. Pierre showed continuously, persuade us that St. Pierre entered his guilty plea intelligently and voluntarily. As St. Pierre himself said, "[T]o enter a plea of not guilty, okay, when in fact I did commit the crime would be tantamount to trying to get away with murder, and that's not my intention." (Tr. of 3/23/01 at 105.) We reject his subsequent attack on the validity of the plea.[5]

*4. Sentencing Instruction Regarding Unanimity Requirement*

---

[5] St. Pierre also claims that his bipolar disorder precluded him from making an informed, rational decision and thereby invalidated his guilty plea. In support of this claim, St. Pierre merely resurrects the arguments we have already rejected as to his alleged unfitness. Just as we found these arguments unpersuasive with respect to fitness, we find them unpersuasive with respect to validity of the plea.

St. Pierre maintains that the trial court improperly instructed him about the requirement under Illinois law that a sentencing jury's verdict be unanimous in order to impose the death penalty. Because we have already concluded that St. Pierre is entitled to a new sentencing hearing, we decline to reach this constitutional issue on the merits.

## CONCLUSION

For the foregoing reasons, we grant St. Pierre's petition for a writ of habeas corpus based on ineffective assistance of counsel at the sentencing phase of the state court proceedings. We deny the petition in all other respects. We order the State to resentence St. Pierre pursuant to the dictates of the Sixth Amendment within a reasonable period following the date of this order.

_Charles P. Kocoras_

Charles P. Kocoras
United States District Judge

Dated:  August 24, 2001